# In the United States Court of Federal Claims

No. 15-794C

(Filed: July 19, 2016)

|  |  |
|---|---|
| ANDREW R. SPENGLER, <br><br>        Plaintiff, <br><br>v. <br><br>THE UNITED STATES OF AMERICA, <br><br>        Defendant. | Keywords: Pro Se Plaintiff; Motion to Dismiss for Lack of Subject Matter Jurisdiction; RCFC 12(b)(1); Trusts; 31 U.S.C. § 1321; Transfer; 29 U.S.C. § 1631. |

*Andrew R. Spengler*, Fort Worth, TX, Plaintiff, *pro se*.

*Alexis J. Echols*, Trial Attorney, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Deborah A. Bynum*, Assistant Director, Commercial Litigation Branch, United States Department of Justice, Washington, DC, for Defendant.

## OPINION AND ORDER

**KAPLAN, Judge.**

This case is currently before the Court on the government's motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims (RCFC). For the reasons set forth below, the government's motion to dismiss is **GRANTED** and this case is **DISMISSED** without prejudice.

## BACKGROUND

The pro se plaintiff in this case, Andrew R. Spengler, is currently serving a fifteen-year sentence in the Federal Correctional Institution in Fort Worth, Texas (FCI Fort Worth), after having been convicted on November 29, 2007 of "Conspiracy to Deprive Civil Liberties and Deprivation of Civil Rights under Color of Law." Def.'s Mot. to Dismiss (Def.'s Mot.) at 1, Doc. No. 14. His projected release date is March 16, 2020. Id.

In a complaint filed on July 27, 2015, Mr. Spengler claims that he is a beneficiary of the Commissary and Welfare Fund for federal prisoners (hereinafter "the Commissary Fund" or "the Fund"), which is designated as a "trust" fund pursuant to 31 U.S.C.

§ 1321(a)(22) (2012). Compl. at 1, Doc. No. 1. According to Mr. Spengler, the United States, through the Bureau of Prisons (BOP), breached its fiduciary duties to inmates by using monies from the Commissary and Welfare Fund to implement a new computer and telephone system. Those systems—designated the Trust Fund Limited Prisoner Computer System (TRULINCS) and the Trust Fund Prisoner Telephone System (TRUFONE) respectively—may be used by inmates to communicate electronically and by telephone with persons outside of the prison. See id. ¶¶ 34, 36.[1]

The gravamen of Mr. Spengler's complaint is that the United States has violated its fiduciary obligations and engaged in disloyalty to the Fund's beneficiaries because—among other reasons—prison authorities monitor TRULINCS and TRUFONE communications for security purposes, and the contents of the communications may be used for investigative, disciplinary, and law enforcement purposes. Id. ¶¶ 30, 34, 39, 40. His complaint also challenges the use of monies in the Fund for a number of other purposes, including but not limited to the implementation of an electronic law library and the purchase of a variety of items such as fingerprint scanners for use at TRULINCS terminals, mailing labels, and mp3 players that remove features to meet security concerns. Id. ¶¶ 87, 103, 107, 134, 135. Mr. Spengler further complains about allegedly unlawful, discriminatory, and improper actions by staff at FCI Fort Worth with respect to their operation of the commissary and their alleged misuse of Fund monies. Id. ¶¶ 209, 219. In addition, Mr. Spengler claims that the United States has violated its fiduciary duties to him by failing to provide him with an accounting of the Fund's expenditures. Id. ¶ 168.

As relief, Mr. Spengler seeks an order directing the United States to provide an accounting of the Fund and an injunction that, among other things, would prevent the government from disseminating TRULINCS data to law enforcement and suspend TRULINCS mailing label requirements. Id. ¶¶ 259, 261–62. He also requests that the government be ordered: 1) to destroy all personal data collected through the TRULINCS program; 2) to restore monies from the Commissary Fund that he claims have been wrongly diverted to pay the costs of confinement rather than used for the prisoners' benefit; 3) to restore funds spent in connection with the TRULINCS programs; and 4) to provide an award of damages for the loss of revenue that he alleges would have been earned had the monies in the Fund not been diverted to these and other allegedly improper purposes. Id. ¶¶ 272–73.

## DISCUSSION

As noted above, the government has moved to dismiss Mr. Spengler's complaint for lack of subject matter jurisdiction. It argues that jurisdiction over Mr. Spengler's

---

[1] According to BOP Program Statement 4500.11, TRULINCS "provides inmates with a computer system that does not jeopardize the safety, security, orderly operation of the correctional facility, or the protection of the public or staff." See Trust Fund/Deposit Fund Manual, U.S. Department of Justice (April 9, 2015), www.bop.gov/policy/progstat/4500011.pdf; Def.'s Mot. App. at 130.

breach of fiduciary duty claims does not lie under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2012), because those claims "sound in tort." Def.'s Mot. at 6. In response, Mr. Spengler argues that he is not asserting a tort claim but rather a claim for money damages that arises out of a statute—31 U.S.C. § 1321(a)(22)—which classifies the Commissary Fund as a "trust," and out of Department of Justice Circular No. 2244, which established the operating procedures for prison commissaries. Pl.'s Resp. to Def.'s Mot. to Dismiss (Pl.'s Resp.) at 3–5, Doc. No. 16. He identifies the latter as the "trust instrument." Compl. ¶ 5. He further asserts that the statute gives rise to a claim for money damages for breach of trust under the reasoning of United States v. Navajo Nation, 537 U.S. 488, 506 (2003) (Navajo I), and related cases. For the reasons set forth below, the Court concludes that it lacks jurisdiction over Mr. Spengler's claims because the statute and regulations upon which he relies do not supply an independent source of a substantive right to money damages that can serve as the basis for this Court's exercise of jurisdiction under the Tucker Act.

I.  **Legal Standards**

A.  **Motion to Dismiss Under RCFC 12(b)(1)**

In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all undisputed facts in the pleadings and draws all reasonable inferences in favor of the plaintiff. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013). It is well established that complaints that are filed by pro se plaintiffs are held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). Nonetheless, even pro se plaintiffs must persuade the court that jurisdictional requirements have been met. Bernard v. United States, 59 Fed. Cl. 497, 499 (2004), aff'd, 98 Fed. App'x 860 (Fed. Cir. 2004).

B.  **Tucker Act Jurisdiction in Statutory Trust Cases**

Pursuant to the Tucker Act, this Court is granted jurisdiction to "render judgment upon any claim against the United States . . . for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages, Mitchell v United States, 463 U.S. 206, 212 (1983) (Mitchell II), but it does not confer any substantive rights on a plaintiff, United States v. Testan, 424 U.S. 392, 398 (1976). Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute, regulation or constitutional provision. Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

An independent source of a substantive right to money damages may be found where a statute "establishes specific fiduciary or other duties" and may "'fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'" Navajo I, 537 U.S. at 506 (quoting Mitchell

3

II, 463 U.S. at 219) (alterations in original). To establish that the United States has accepted a particular fiduciary obligation, "[a plaintiff] must identify statutes or regulations that both impose a specific obligation on the United States and 'bear[ ] the hallmarks of a conventional fiduciary relationship.'" Hopi Tribe v. United States, 782 F.3d 662, 667 (Fed. Cir. 2015) (quoting United States v. Navajo Nation, 556 U.S. 287, 301 (2009) (Navajo II)) (alteration in original).

## II.  Application of Standards

The Commissary and Welfare Fund was created in 1932, two years after the U.S. Department of Justice (DOJ) authorized the establishment of commissaries at all correctional institutions under BOP's jurisdiction. See Department of Justice Circular No. 2244, Rules Governing the Control of Prisoners at the Several Penal and Correctional Institutions (Jan. 1, 1932) (hereinafter "Circular No. 2244"); see also Office of Legal Counsel, Fiduciary Obligations Regarding Bureau of Prisons Commissary Fund, 19 Op. O.L.C. 127 (1995) (citing Department of Justice Circular No. 2126, Rules Governing the Control of Prisoner's Funds at the Several Penal and Correctional Institutions (Aug. 1, 1930)). The purpose of the commissaries is to provide inmates with the opportunity to purchase items such as hygiene products, postage supplies, over the counter medicine, and snacks. See Fiduciary Obligations Regarding Bureau of Prisons Commissary Fund, supra, at *2. Circular No. 2244 established the operating procedures for the commissaries. It also created separate U.S. Treasury accounts for the "Commissary and Welfare Fund" and for the "Prisoners Trust Fund" at each BOP correctional facility. See Circular No. 2244.

The Commissary and Welfare Fund consists of revenues generated by the sale of goods at prison commissaries. Compl. ¶ 9. The Prisoners Trust Fund, on the other hand, consists of personal monies prisoners earn working in the prison and money that is sent to them by family, friends, or other sources while they are incarcerated. See Def.'s Mot. App. at 12, 18, 68, 79, 87–88. Inmates may use the money in their personal trust accounts to pay for items purchased in the commissary. See id. at 18, 45.

In 1934, as part of the Permanent Appropriation Repeal Act, both the Prisoners Trust Fund and the Commissary Fund were classified as trust funds. See Pub. L. No. 73-473, § 20(a), 48 Stat. 1224, 1233 (1934) (codified at 31 U.S.C. § 1321(a)(21)–(22)). Pursuant to that Act, monies that "are received by the United States Government as trustee" for the funds "shall be deposited in an appropriate trust fund account in the Treasury." Id. § 1321(b)(1). Further, with exceptions not relevant here, "amounts accruing to these funds are appropriated to be disbursed in compliance with the terms of the trust." Id.

As noted, Mr. Spengler argues that this Court has jurisdiction over his claims for damages because the Commissary Fund is a statutory trust, which he alleges imposes fiduciary duties on BOP with respect to its administration of the Fund. But while the Commissary Fund is classified as a "trust" under 31 U.S.C. § 1321(a) (as are some ninety other diverse funds), it is well established that such classification alone is not sufficient to establish that Congress intended to impose specific fiduciary obligations on the United

4

States that would subject it to a claim for monetary damages for their breach. See Hopi Tribe, 782 F.3d at 667 (citing United States v. Mitchell, 445 U.S. 535, 541–42 (1980) (Mitchell I) (holding that the General Allotment Act, which stated that the United States was to hold land "in trust for the sole use and benefit of the Indian," created only a "limited trust relationship" that did not establish a fiduciary duty to manage resources on the land giving rise to a claim for money damages)); Navajo I, 537 U.S. at 508, 511 (holding that coal mining regulations did not impose fiduciary duties on the United States, despite the fact that the coal itself was held in trust for the Navajo Nation); United States v. Jicarilla Apache Nation, 564 U.S. 162, 174 (2011) (noting that "Congress may style its relations with the Indians a 'trust' without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is 'limited' or 'bare' compared to a trust relationship between private parties at common law"). Accordingly, the mere designation of the Commissary and Welfare Fund as a "trust" is not sufficient to establish congressional intent to subject the United States to claims for monetary damages based on the improper expenditure of monies in the Fund.

Further, the legislative history of § 1321 does not reveal congressional intent to impose any particular fiduciary duties on the government with respect to any of the funds designated as "trust" funds under that statute. The general purpose of the Permanent Appropriation Repeal Act was to reassert congressional control over the appropriations process by abolishing permanent appropriations. H.R. Rep. No. 1414, 73d Cong., 2d Sess. 2 at 2 (1934). Section 20(a) (which is codified at § 1321) established exceptions to the policy against permanent appropriations by denominating certain permanent accounts as "trust funds" for accounting purposes in order to prevent the Comptroller General from exercising control over those accounts. See Fiduciary Obligations Regarding Bureau of Prisons Commissary Fund, supra, at *6. There is no reason to believe that when Congress designated the Commissary Fund as a trust for this specialized purpose it also intended to subject the United States to liability for money damages for breach of fiduciary obligations. See Mitchell I, 445 U.S. at 544 (examining the legislative history of the General Allotment Act and concluding that the purpose of the act was not to give the government control over the use of land and subject it to money damages, but rather "to prevent alienation of the land and to ensure that allottees would be immune from . . . state taxation"); see also Franklin Sav. Corp. v. United States, 56 Fed. Cl. 720, 752 (2003) (finding that the banking statutes in question were intended to strengthen enforcement powers and civil sanctions, and to curtail investments that pose unacceptable risks; the purpose of the statutes did not involve the government acting as anything other than a regulating body).

In addition, there is nothing in either issuance that indicates an intent by the United States to take on specific fiduciary obligations in the administration of the Commissary Fund. According to BOP Program Statement 4500.11, supra, the purpose of the Commissary Fund is "to provide prisoners the privilege of obtaining merchandise and services either not provided by the Bureau or of a different quality than provided by the Bureau." Def.'s Mot. App. at 18. As contrasted with the monies held in the Prisoner's Trust Fund, the monies in the Commissary Fund do not in any sense belong to the prisoners; in fact, Circular No. 2244 expressly denies inmates any entitlement to the earnings of the Commissary. Circular No. 2244 ¶ 22; cf. Salter v. United States, 119 Fed.

5

Cl. 359, 364 (2014) (characterizing as "reasonable" the argument that "the creation of a trust account to hold the funds of an inmate [statutorily recognized by 31 U.S.C. § 1321(a)(21)] and pursuant to [Circular No. 2244] imposes fiduciary responsibilities on the BOP").

Finally, BOP manages the Commissary Fund operations and controls how the funds are dispersed without any involvement by the prisoners. Compl. ¶ 11. Circular No. 2244 provides that the monies in the Commissary Fund may either be used for operation of the commissary, or, with the approval of the BOP Director, "may be disbursed on written order of the Warden for any purpose accruing to the benefit of the inmate body, as a whole, such as amusements, education, library, or general welfare work." Circular No. 2244 ¶¶ 16, 41. This language supports the notion that—where the funds are to be used for purposes other than the operation of the commissary—BOP will apply the funds to purposes that benefit the overall prison population. But that proviso in and of itself provides no indication either that the United States intended to take on any general or specific fiduciary obligations in its administration of the Commissary Fund, or that the moneys in the fund could only be used in a manner that promotes the best interests of the inmates, as would be the case with a traditional trust. And unlike the Indian trust cases, which arise in the context of the historical "general trust relationship" between the United States and the Indian population, there is no historic trust relationship between the United States and the inmates of its prisons. See Mitchell II, 463 U.S. at 225.

In his Supplemental Memorandum, Mr. Spengler cites the Sixth Circuit's decision in Washington v. Reno, 35 F.3d 1093 (6th Cir. 1994), for the proposition that the United States has taken on fiduciary duties toward the inmates with respect to its administration of the Commissary Fund. Pl.'s Suppl. Br. at 2, Doc. No. 29. In that case, the plaintiff inmates challenged BOP's use of the Commissary Fund to finance certain salaries and other expenses connected to the installation and operation of a new phone system to replace the practice of permitting inmates to place an essentially unlimited number of collect calls to persons outside of the prison. Reno, 35 F.3d at 1095. The new system afforded the inmates the opportunity to purchase direct-dial phone credits at the prison commissary, but only once a week, and limited conversations to those with individuals named on a list of people approved by correction officials. Id. at 1094. The plaintiffs claimed that this use of the Commissary Fund violated 31 U.S.C. § 1321(b), which, as noted above, provides that "[a]mounts accruing to [the Commissary Fund] . . . are appropriated to be disbursed in compliance with the terms of the trust"—i.e., the terms of Circular 2244. Id. at 1101. In particular, they argued that any expenditure from the Fund must be for a "purpose accruing to the benefit of the inmate body, as a whole," as the Circular provides, and contended that the new phone system did not meet that requirement. Id. In its decision, the Sixth Circuit held that the inmates had standing to challenge the allegedly unlawful expenditures to the extent that they could show that BOP's method of funding the new system "cause[d] them injury that would be redressed, in a non-speculative way, by an order precluding use of Fund money in this way." Id. at 1102.

The critical distinction between Reno and this case, however, is that the relief requested in Reno was purely injunctive in nature. Id. at 1095. The plaintiffs did not

6

request, as does Mr. Spengler, an award of damages. The Sixth Circuit therefore had no occasion to address the issue before this Court, which concerns whether Congress—in characterizing the Commissary Fund as a "trust" for purposes of 31 U.S.C. § 1321—intended to impose specific fiduciary obligations on the United States that would subject the United States to a claim for monetary damages for its breach. It is not remarkable that—assuming a plaintiff has standing—a district court has jurisdiction to enjoin governmental expenditures that violate statutory limitations. But absent a money-mandating source of law, this Court lacks jurisdiction to consider a suit (like Mr. Spengler's) which seeks an award of damages for similar violations. And it correspondingly lacks jurisdiction over Mr. Spengler's claims for injunctive relief, as such claims are not incidental to a claim for monetary relief that is properly before the Court. See James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998) (although limited equitable relief is sometimes available in Tucker Act suits, any such relief "must be 'an incident of and collateral to' a money judgment") (quoting 28 U.S.C. § 1491(a)(2)).

### III.   Transfer

Pursuant to 28 U.S.C. § 1631 (2012), whenever a court finds that it lacks jurisdiction over an action, "the court shall, if it is in the interest of justice, transfer such action . . . to any other such court in which the action . . . could have been brought at the time it was filed or noticed." According to the government, it would not be appropriate to transfer Mr. Spengler's case to a district court for consideration of his claims for injunctive relief because Mr. Spengler failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a) (2012). It contends that, "[a]lthough Mr. Spengler pursued administrative remedies related to the claims at issue in this lawsuit, he did not pursue his claims through the final appeal stage." Def.'s Mot. at 8. The Court agrees.

Section 1997e(a) of Title 42 of the U.S. Code provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." "Exhaustion in cases covered by § 1997e(a) is now mandatory." Porter v. Nussle, 534 U.S. 516, 524 (2002). The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Id. at 532. This requirement has been applied in suits regarding all aspects of incarceration, including claims of overcrowding, negligent medical care, and improper debiting of inmate trust accounts (the Prisoner Trust Fund). See Napier v. Laurel Cty., 636 F.3d 218 (6th Cir. 2015); Williams v. Metro. Det. Ctr., 418 F. Supp. 2d 96 (E.D.N.Y. 2005); Johnson v. Ozmint, 567 F. Supp. 2d 806 (D.S.C. 2008). Further, the Supreme Court has held that "Congress meant to require procedural exhaustion regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible." Booth v. Churner, 532 U.S. 731, 739 (2001).

Mr. Spengler's suit alleges violations of law in connection with the system that BOP has implemented to permit inmates to communicate, either electronically or by phone, with the outside world. See Compl. ¶ 117. His complaint also includes claims about various other conditions of his confinement, including access to law libraries, the

methods by which sales are conducted at the commissaries, limitations on his ability to send letters by U.S. Mail, and the alleged obstruction of inmates' ability to communicate with family and friends. See Compl. ¶¶ 92, 116, 145–46. In short, this action is one "brought with respect to prison conditions" within the meaning of 42 U.S.C. § 1997e(a), and is therefore subject to its exhaustion requirement.

To satisfy the exhaustion requirement, "prisoners must complete the administrative review process in accordance with the applicable procedural rules" defined "by the prison grievance process itself." Jones v. Bock, 549 U.S. 199, 218 (2007). For the purposes of this case, the applicable procedural rules are set forth in 28 C.F.R. §§ 542.10–.19 and in the BOP Program Statement 1330.18, entitled "Administrative Remedy Program." See Pl.'s Resp. App. Ex. A. BOP's Administrative Remedy Program is supplemented by FCI Fort Worth Local Policy 1330.13 (E) (Fort Worth Local Policy), which describes the specific procedures inmates must follow at FCI Fort Worth. See Pl.'s Resp. App. Ex. B.

Under the applicable rules, with exceptions not relevant here, an inmate who wishes to raise concerns about any aspect of prison life is required to first present their concerns informally to staff at the prison on a form prescribed by BOP. 28 C.F.R. § 542.13(a); Pl.'s Resp. App. Ex. B at 23. According to FCI Fort Worth Local Policy, the deadline for completion of informal resolution and for the inmate to file a formal institutional complaint is within twenty days "following the date on which the basis for the Request occurred." Pl.'s Resp. App. Ex. B at 23; see 28 C.F.R. § 542.14(a). A final response to a formal complaint at the institutional level, signed by the prison's Warden, "will be delivered to the inmate within [twenty] calendar days of the date the request was received." Pl.'s Resp. App. Ex. B at 24; see 28 C.F.R. § 542.18. An inmate may then file an appeal of the Warden's decision to the Regional Director within twenty calendar days of the date of the institution's signed response, and the Regional Director has thirty calendar days to respond. 28 C.F.R. §§ 542.15(a), 542.18; Pl.'s Resp. App. Ex. B at 24. If the inmate is not satisfied with the Regional Director's response, he may—within thirty days—file a Central Office Appeal. 28 C.F.R. § 542.15(a) (Title 28 uses the terms General Counsel and Central Office interchangeably); Pl.'s Resp. App. Ex. B at 24. The Central Office then has forty days to respond to the appeal. 28 C.F.R. § 542.18. If the inmate does not receive a response to a request at any level within the time allotted, the inmate may consider the absence of a response to be a denial. 28 C.F.R. § 542.18. "Appeal to the General Counsel is the final administrative appeal." 28 C.F.R. § 542.15(a); Pl.'s Resp. App. Ex. A at 9.

The rules provide that the time limits for prison authorities to respond to an inmate's grievance set forth above may be extended by twenty days at the institution level, thirty days at the regional level, or twenty days at the Central Office level. 28 C.F.R. § 542.18. Inmates must be informed of a response time extension in writing. Id. Particularly significant for the purposes of this case, at any point in the process, submissions may be rejected and returned to inmates without response if the submission does not meet BOP requirements. Id. § 542.17. In those circumstances, if the defect is correctible, the inmate is given notice of the defect and an opportunity to correct and

resubmit the appeal. Id. § 542.17(b). If the inmate is not given the opportunity to correct the defect and resubmit, then the inmate may appeal the rejection. Id. § 542.17(c).

According to Carolyn Lanphear, an Administrative Remedy Specialist for BOP, Mr. Spengler filed several formal administrative remedy requests related to the claims in this case, but those requests were defective because they lacked required information or documentation, or because they were filed at the wrong level in the administrative process. Def.'s Mot. App. Ex. 4, Lanphear Decl. ¶¶ 1, 6–9. She further states that Mr. Spengler did not take advantage of the opportunities he was provided to correct and resubmit his defective requests. Id. ¶¶ 7–9.

Mr. Spengler does not take issue with Ms. Lanphear's description of the specific history of his requests, but complains generally about the prison's allegedly frequent failure to comply with the regulatory response deadlines and other procedural requirements. Pl.'s Resp. at 9. Specifically, he claims that FCI Fort Worth: 1) failed to respond to informal requests; 2) failed to respond to formal requests within the required administrative remedy timeframe; 3) failed to issue "remedy receipts" that identify the date on which a formal complaint has been filed, resulting in the improper extension of the prison's response deadline; and 4) failed to timely provide inmates with copies of responses, resulting in the rejection of appeals at higher levels. Id. at 9–11. But even assuming the accuracy of some or all of these general allegations, he has not established that they prevented him from completing the administrative process with respect to the breach of trust claims he seeks to bring before this Court.

The first formal complaint Mr. Spengler filed concerning a breach of trust (Remedy ID 775934-R1) was submitted at the regional level on April 17, 2014. Def.'s Mot. App. Ex. 4, Lanphear Decl. ¶ 7; Compl. App. at 92. That complaint was rejected because Mr. Spengler failed to provide either a copy of his institution's Administrative Remedy Request form or a copy of the Warden's response. Def.'s Mot. App. Ex. 4, Lanphear Decl. ¶ 7. In accordance with the procedural rules set forth above, Mr. Spengler was given time to cure these deficiencies by submitting the relevant documents, but he did not do so. Id. He therefore failed to exhaust his remedies with respect to Remedy ID 775934-R1.

According to Ms. Lanphear, Mr. Spengler's second relevant administrative remedy request (Remedy ID 776703-F1)—filed on April 24, 2014 at FCI Fort Worth— complained "that inmates were being charged for mailing labels for [TRULINCS]" and claimed "extortion because inmates are beneficiaries of the trust fund." Id. ¶ 8. This request was rejected on the grounds that Mr. Spengler failed to provide specific information about the request. Id. ¶ 8; Compl. App. at 93. Instead of supplying additional information and resubmitting his request at the institutional level, however, Mr. Spengler filed two appeals to the Central Office level (Remedy ID 776703-A1 and Remedy ID 776703-A2). Compl. App. at 94, 98–99. Both of these appeals were rejected because they had been filed at the wrong level and to the wrong office. Id. at 95, 100; Def.'s Mot. App. Ex. 4, Lanphear Decl. ¶ 8. Mr. Spengler was advised that he needed to resubmit his request at the institutional level and procure the Warden's review and response before

9

appealing. Compl. App. at 95, 100; Def.'s Mot. App. Ex. 4, Lanphear Decl. ¶ 8. He did not do so. Def.'s Mot. App. Ex. 4, Lanphear Decl. ¶ 8.

Another administrative remedy request regarding breach of trust funds was filed at the regional level on July 17, 2014 (Remedy ID 790971-R1) and rejected for failure to attempt informal resolution prior to submitting an administrative remedy or failure to provide evidence of such informal resolution. Id. ¶ 9; Compl. App. at 103, 105. Again, Mr. Spengler did not resubmit his rejected claim, as required by the applicable regulations. Def.'s Mot. App. Ex. 4, Lanphear Decl. ¶¶ 7, 9.

In short, Mr. Spengler has failed to meet his burden of demonstrating exhaustion of administrative remedies with respect to the claims made in this case. Because Mr. Spengler's failure to exhaust administrative remedies would deprive the district court of jurisdiction over Mr. Spengler's claims, a transfer of the case to district court pursuant to 28 U.S.C. § 1631 would be inappropriate. See Jackson v. United States, 80 Fed. Cl. 560, 565 (2008) (declining to transfer the case to district court where plaintiff had failed to exhaust his administrative remedies within the Social Security Administration with respect to each of his claims for social security benefits); Ayres v. United States, 67 Fed. Cl. 776, 779 (2005) (declining to transfer tort claims to district court where plaintiff failed to exhaust administrative remedies as required by Federal Tort Claims Act).

## CONCLUSION

On the basis of the foregoing, the government's motion to dismiss pursuant to Rule 12(b)(1) is **GRANTED**, and this case is **DISMISSED** without prejudice. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

_____
ELAINE D. KAPLAN
Judge